IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| CHAD ERIC BJORK, | CV 18-00107-H-DLC-JTJ |
| Plaintiff, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| CHRISTINE SLAUGHTER (DHO/DHI), TOM BOLTON (MSP TRAINING), SAM JOVANOVICH (A UNIT MANAGER), PAUL REES, KRISTINE COBBAN, HAROLD STREY, and RANDALL JONES (SERGEANT), | |
| Defendants. | |

Plaintiff Chad Bjork, a former Montana State Prison (MSP) prisoner[1]

proceeding without counsel, has filed a Complaint raising the following claims[2]:

_____

[1] The Court has been informed that Mr. Bjork is no longer at MSP. Therefore, his requests for injunctive relief are moot and dismissed. *Alvarez v. Hill*, 667 F.3d 1061 (9th Cir. 2012). However, he maintains monetary damages claims that survive his release from prison.

[2] Several of Bjork's other claims were already dismissed. (Docs. 32 and 40.)

(1) that on July 8, 2018 Defendant Randall Jones used excessive force and denied Bjork protective eye wear for a medical eye condition and then retaliated against him for writing a grievance (Complaint, Doc. 2 at 7);

(2) that on October 31, 2018, Defendant Tom Bolton conducted an unreasonable strip search (Complaint, Doc. 2 at 9);

(3) that Defendant Jovanovich acquiesced in Officer Jones' actions and retaliated against Bjork for reporting Officers Jones and Bolton (Complaint Doc. 2 at 11-12);

(4) that Christine Slaughter retaliated against him for asking for an Americans with Disabilities Act accommodation at his disciplinary hearing and retaliated against him by finding him guilty of disciplinary violations (Complaint, Doc. 2 at 13-14);

(5) that Dr. Rees failed to treat the injuries Bjork received on October 31, 2018 (Amended Complaint, Doc. 22, Count VIII);

(6) that Defendant Strey punished Bjork for filing a PREA complaint against Defendant Bolton regarding the October 31, 2018 search (Amended Complaint, Doc. 22, Count IX); and

(7) that Defendant Cobban worked in concert with other Defendants by threatening Bjork and his witnesses with retaliatory discipline if they continued to

grieve staff members involved in the October 31, 2018 strip search of Bjork
(Amended Complaint, Doc. 22, Count XII).

The following motions are pending before the Court: Plaintiff's motion for
default judgment/contempt (Doc. 70); Plaintiff's "Response Brief to Defendants'
Responses and Objections…" (construed as a motion to compel) (Doc. 75);
Plaintiff's "Response Brief to Defendant Rees's Responses…" (construed as a
motion to compel) (Doc. 76); Plaintiff's motion for preliminary injunction (Doc.
77); Defendants' motion for leave to file under seal (Doc. 78); Defendants' motion
for summary judgment (Doc. 80); and Plaintiff's motion for mediation (Doc. 89).

### A. Motion for sanctions, default judgment and/or contempt (Doc. 70)

Bjork's motion for sanctions and default judgment and/or contempt (Doc.
70) is a result of this Court's April 28, 2020 order directing the Defendants to serve
their responses to Bjork by May 15. Neither party, throughout this litigation, has
been meticulous in answering discovery or complying with deadlines. (*See* Docs.
56, 63 and 69.) In this instance, on May 16, the day after the responses were to be
served, Plaintiff filed a motion for sanctions, asking for the entry of judgment.
Defendants claim that their discovery was, essentially, lost in the mail, having been
mailed on the 15th, and that by the time Defendants filed their response, the
discovery had arrived. Plaintiff replies that Defendants have perjured themselves
by stating that they had mailed all of the documents on the 15th, when really it was

the 18th. (Doc. 74 at 1.) (Some documents were mailed on Friday the 15th, and some, apparently, on the following Monday.)

Documents are served when placed in the mail. Fed. R. Civ. P. 5(b)(2)(C). Plaintiff signed this motion on May 16, before Defendants' responses, mailed on the 15th, could have arrived. Due to the challenges of the current pandemic postal situation, in addition to the logistics of mail to a prisoner, the Court declines the opportunity to sanction Defendants for their service of their discovery, even if one document was served a few days late. Plaintiff requests the ultimate sanction for a delay of two days. Plaintiff's motion should be denied.

### B. Plaintiff's "Response Brief to Defendant's Responses" (Doc. 75)

Plaintiff's two "Response Briefs" (Docs. 75 and 76) are more aptly considered motions to compel, though Defendants did not respond to them as such. In each, Plaintiff outlines his objections to the discovery provided by Defendants. The Court will consider the objections in turn.

As a preliminary matter, as Defendants pointed out in their response to Plaintiff's prior motion to compel, Local Rule 26.2(b) requires "the party filing the motion [regarding discovery to] attach as exhibits to the motion all of the documents relevant to the motion if the documents have not been previously filed." Local Rule 26.3(c)(2)(C) requires attachment of the full text of the discovery sought, and the full text of the response. The Court's analysis of Plaintiff's

objections in Doc. 75 is significantly hamstrung by Plaintiff's failure to provide all of the information required by the rule.

      1.  Video (Plaintiff's RFP 1[3])

Plaintiff requests production of video of the search. Defendants apparently arranged a viewing of the video but objected to Plaintiff seeing all available angles for security reasons. (Doc. 75 at 1 – 2.) (Defendants' lack of response to this brief requires the Court to rely on Plaintiff's characterization of Defendants' objections.) Plaintiff viewed the video he was allowed to see on May 28, 2020 and contends that it supports his position as to the propriety of the search. (Doc. 88 at 3.) What happened prior to and during the search, and what could be seen of the search from where, are the heart of the claims against Defendant Bolton. The Court respects Defendants' concerns about security but will require Defendants to file all of the videos under seal for *in camera* review by the Court. The videos are the best evidence to resolve important factual disputes, and, as discussed more thoroughly below, Defendants' reluctance to produce them may lead to an adverse inference as to their evidential value. In additional, Defendants do not appear to have provided a privilege log that would explain in more detail why these videos could not be produced.

---

[3] Because Plaintiff did not comply with the rule requiring him to file the text of the request, these request numbers are taken from his brief, and the Court cannot be assured they are accurate.

### 2.  Strip search log (RFP 2)

Plaintiff seeks the strip search log from his search, and Defendants respond that whatever they have has been produced. Plaintiff is not satisfied with this response (Doc. 75 at 2) but provides no legal grounds for why that is not a sufficient answer. (Doc. 75 at 3.) The Court will not compel a further response.

### 3.  Transcripts of Special Needs Committee meetings (RFP 12)

Plaintiff seeks transcripts of the meetings in which inmates' special medical needs are discussed by the Special Needs Committee. Defendants objected on privacy grounds but then stated that no such transcripts exist. Plaintiff provides several reasons why such documents would help his case, but given that the response is that the transcripts do not exist, the Court will not compel a further response.

### 4.  Medical files from Plaintiff's medical history (RFP 13)

Plaintiff seeks "All medical files and documents that Defendants have in their possession of Plaintiff's medical information from Plaintiff's medical history prior to incarceration on August 11, 2016." (Doc. 75 at 3.) Defendants respond that "No responsive documents exist." *Id*. Puzzlingly, in his objection Plaintiff questions why the documents from August to October 2016 are not included in Defendants' disclosure, when that is explicitly not what he asked for. *Id*. at 3 – 4. Plaintiff wants this information about his pre-incarceration health care to explain

the basis for his repeated claims for ADA accommodations. He maligns Defendants for not providing any accommodation, but he cannot establish that there is evidence that an accommodation is required, or that Defendants were aware of any alleged disability. The motion is denied.

### 5.  Reports of excessive use of force by Randy Jones

In its order on Plaintiff's prior motion to compel, the Court limited one of Bjork's requests to previous reports of excessive force by Randy Jones and compelled response. (Doc. 63 at 7 – 8.) Plaintiff's brief is less than ideally clear here, but it appears that Defendants have not produced these documents, maybe suggesting that no documents exist. (Doc. 75 at 4.) Plaintiff alleges that he knows of at least one document that would be in that record and so suggests Defendants are willfully withholding evidence, which would be very disturbing in light of this Court's prior order. The relevance of this information is not clear, given the treatment of the excessive force claim against Jones, described below. However, to clarify whether Defendants have simply disregarded this Court's order, they are direct to file with the Court the timely response they provided to Plaintiff.

### C. Plaintiff's "Response Brief to Defendant Rees's Responses" (Doc. 76)

Plaintiff filed a similar brief seeking compulsion or sanctions regarding the individual discovery responses of Defendant Rees. Again, Plaintiff raises the issue of the tardiness of these responses, received on May 20, and the Court will not

sanction Rees in this instance. This time, Plaintiff did provide copies of most of the responses as an exhibit.

    1.  National Standard of Care (Interrogatory 3)

Bjork asks Defendant Rees what is "the national standard of care for serious debilitating pain?" (Doc. 76-2 at 2.) Defendant Rees responds that the request is irrelevant. *Id.* (Plaintiff's copy of this answer does not include the full answer, but the portion submitted is sufficient.) Presumably, Dr. Rees' response is based on the idea that the medical condition for which he supposedly denied Bjork treatment on October 31, 2018 was not a condition that gives rise to serious debilitating pain. At the time of the search, Bjork went to the infirmary with high blood pressure, heart burn, and to get a sexual assault exam. (Doc. 79 at 1.) The form says nothing at the time about pain. Bjork also did not allege debilitating pain when he sought further treatment for his condition three weeks later. (Doc. 79 at 5 (stating Plaintiff was experiencing 1-2 on a ten-point pain scale).) As explained more below, Dr. Rees did not see Bjork related to this injury. Since the injury did not cause debilitating pain, Dr. Rees' opinion about that standard of care is irrelevant.

Additionally, Dr. Rees may or may not be qualified to testify on a national standard for debilitating pain. His generalized opinion in a discovery response is irrelevant. While a treating physician in some cases may qualify to explain a national standard of care, in Montana, that expertise as a treating physician arises

from his treatment of the patient. *Norris v. Fritz*, 2012 MT 27, 364 Mont. 63, 270 P.3d 79. The claim against Rees arises from the failure-to-treat after the search claim, for which debilitating pain is not an issue; Rees' opinion about the standard of care for debilitating pain appears irrelevant. The motion will be denied.

### 2.  Physical Therapy (Interrogatory 5)

Plaintiff asks why he has not been to physical therapy, and Defendant Rees responds. Bjork provides no grounds to demand an additional response from Rees; he just does not like the answer. (Doc. 76 - 2 at 5.) The Court will not compel a further response.

### 3.  Special Needs Committee disapprovals (Interrogatory 7)

Plaintiff asks "How many of the treatments, medications and medical devices have the Special Needs Committee disapproved of since you began your position at MSP?" (Doc. 76 - 2 at 6.) Rees objected to the relevance and burden of the request and then stated that he has no personal knowledge of the number. Plaintiff wants to establish a pattern of denying medical needs to MSP prisoners. However, his allegations against Dr. Rees are specific, related to specific care he did or did not receive. Whether other patients received other Special Needs Committee treatments is irrelevant to that question. The Court will not compel a further response.

### 4.  Interrogatories 12, 23, 24

Plaintiff's final objections group these three interrogatories together, which relate to medical care that he believes he should have received. The interrogatories ask Rees to hypothesize about or recommend treatment related to Bjork, whom he had not seen as a patient for a year as of the time of answering the discovery. Interrogatory 12 requests the national standard of care for hypertension. (Doc. 76 at 3.) Interrogatory 23 asks for recommendations for Bjork's medical care and medications. *Id.* Interrogatory 24 is a mystery. Bjork did not submit a copy of it with his other requests in the attachment to his brief, and the brief refers to the request but does not reiterate and explain it. (Doc. 76 at 4.) The question appears to operate on a sort of respondeat superior theory—Rees should be responsible for the actions of other medical providers who treated Bjork, as MSP Head of Medicine. (Doc. 76 at 4.) But the Court will not speculate. These requests are all speculative and require a prospective or hypothetical medical opinion that is not appropriate as a discovery response. The Court will not compel answers.

### D. Plaintiff's Motion for Emergency Prohibitory Injunction (Doc. 77)

Plaintiff's motion for an injunction (Doc. 77) relates to his loss of a typewriter in prison (though the motion was typed). As Bjork is no longer incarcerated, the motion should be denied as moot.

### E. Defendants' motion to file under seal (Doc. 78)

Defendants have moved to file "Defendant's Exhibit A" under seal, in respect of Plaintiff's medical privacy concerns. (Docs. 78 and 78-1.) Plaintiff Bjork has objected (Doc. 93), concerned that "additional information" would delay ruling on these motions, and perhaps not fully understanding that the Exhibit has already been filed in redacted form (and lodged with the Court in unredacted form). Because there is no prejudice to Plaintiff, who is aware of these documents, and in the interest of protecting his medical privacy, the Court will grant the motion.

### F.  Plaintiff's motion for mediation (Doc. 89)

Plaintiff Bjork filed a motion seeking a settlement conference, a status update, and a new scheduling order. (Doc. 89.) Defendants did not respond. The Court will not order mediation at this point. Now that Plaintiff is no longer incarcerated, presumably he has greater freedom to communicate directly with Defendants following the issuance of this order.

### G. Defendants' motion for summary judgment (Doc. 80)

Defendants filed a motion for summary judgment on all claims, with a surprisingly perfunctory Statement of Undisputed Facts, given the breadth of the allegations in this matter. (Docs. 80, 81 and 82.) But Bjork also failed to comply with the requirements of Local Rule 56.1 in his response, requiring the Court to scour the volumes of information for the facts at issue. It is the parties' burden to

point out the relevant evidence to the Court, and they bear any consequences of their failure to do so.

1. Standard for summary judgment

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Id.* at 324. The Court views the facts and inferences from them in the light most favorable to Bjork as the non-moving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 474 U.S. 574, 587-88 (1986); *Betz v. Trainer Worthham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

2. Analysis

The claims in this case cover wide factual territory. As relevant, the facts as to each claim will be described independently.

a.  Claims against Randall Jones

Plaintiff's first claim is that on July 8, 2018 Defendant Randall Jones used excessive force and denied Bjork protective eye wear for a medical eye condition and then retaliated against him for writing a grievance (Complaint, Doc. 2 at 7). Bjork had a pair of tinted sunglasses that he had acquired on July 2, 2018, he asserts, to manage a medical condition. (Doc. 87 at 6.) On July 8, 2018, Defendant Jones confiscated the glasses, claiming they were unauthorized, poked Bjork in the chest, and sent him out into the bright sunlight. *Id.* at 6-7. Plaintiff alleges that he told Jones he wanted to grieve this treatment, and, as a result, Jones wrote him up for an infraction for lying about whether the glasses were medically prescribed. On July 9, Jones wrote a disciplinary infraction report that stated that Bjork had told Jones that Jovanovich approved the glasses, which was a lie. Doc. 87 -2 at 28. Plaintiff also alleges that he had a seizure and migraines as a result of going out into the sun without his glasses. (Doc. 87 at 6 – 7.) However, there do not appear to be documents in the record detailing any medical care he received. He later claims to have been confused by his migraines into making inaccurate statements— presumably those that Jones had considered a lie. (Doc. 87-2 at 30.) Bjork claims

to have witnesses who say they heard Jones say he would write Bjork up for grieving him. (Doc 87 – 2 at 17, 19.)

Plaintiff's claims against Jones have two parts, excessive force and retaliation.

### i.    Excessive force

Bjork's excessive force claim has no legs. "'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (*quoting Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). Where prison officials stand accused of using excessive force in violation of the Eighth Amendment "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . ." *Whitley*, 475 U.S. at 319.

The following factors are considered in determining whether the use of force was wanton and unnecessary: the need for force; the relationship between the need and the amount of force used; the extent of the injury inflicted; 'the threat reasonably perceived by the responsible officials', and 'any efforts made to temper

the severity of a forceful response.' *Hudson*, 503 U.S. at 7 (citing *Whitley*, 476 U.S. at 321).

The crucial elements here are "the amount of force used" and "the extent of the injury inflicted." The only force Bjork alleges is a poke, and though in various pleadings he blames catastrophic consequences on this poke, he did not seek medical attention for the poke, nor can he provide any support for his claim that this poke was even mildly damaging. While a poke may be disrespectful, unnecessary, or even reproachable, it is not an excessive amount of force in violation of the 8th Amendment.

ii.    Retaliation

The second aspect of Bjork's claims against Jones concerns retaliation for his statement that he wanted to grieve the poke and the confiscation of his glasses.

"A prisoner suing prison officials under section 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline." *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir.2003) (citations and internal quotations omitted). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the

inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005). "Chilling" does not necessarily mean halting.

Retaliation is not established simply by showing adverse activity by defendant after protected speech; rather, plaintiff must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F. 3d 893, 899 (9th Cir. 2000). *Compare* Huskey, 204 F.3d 893 (summary judgment proper against plaintiff who could only speculate that adverse employment decision was due to his negative comments about his supervisor six or seven months earlier) with *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315 – 16 (9th Cir. 1989) (evidence of timing and nature of suspensions sufficient to infer retaliatory motive). "A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001). "Timing can properly be considered as circumstantial evidence of retaliatory intent." *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995). Plaintiff must show that the alleged retaliation was a "substantial" or "motivating" factor in the decision resulting in the adverse action. *See Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315 (9th Cir.1989) (citation omitted).

Plaintiff also must prove the absence of legitimate penological reasons for the alleged retaliatory conduct. *See Pratt v. Rowland*, 65 F.3d at 806.

Motivation generally presents a jury question. *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315 (9th Cir. 1989). In the First Amendment context, a plaintiff generally raises a genuine issue of material fact on the question of retaliatory motive when the plaintiff "produces, in addition to evidence that the defendant knew of the protected speech, at least (1) evidence of proximity in time between the protected speech and the allegedly retaliatory decision, (2) evidence that the defendant expressed opposition to the speech or (3) evidence that the defendant's proffered reason for the adverse action was false or pretextual." *Pinard v. Clatskanie School Dist. 6J*, 467 F.3d 755, 771 n. 21 (9th Cir.2006) (citing *Keyser v. Sacramento City Unif. Sch. Dist.*, 265 F.3d 741, 751-52 (9th Cir.2001)).

Bjork himself admits he lied about whether his glasses were approved. Whether it was due to confusion from a headache or otherwise, he does not dispute that he lied to Jones, and therefore, Jones was entitled to write him up for it. The penological value of writing up inmates for lying about what was, in effect, contraband, is plain. He has not shown that retaliation was a substantial or motivating factor in Jones' choice to sanction him for lying. Summary judgment should be granted to Jones.

### b.  Claim against Tom Bolton

Plaintiff's second claim is that on October 31, 2018, Defendant Tom Bolton conducted an unreasonable strip search, in violation of the Fourth Amendment (Complaint, Doc. 2 at 9). The parties agree that Defendant Bolton was conducting a training with new officers in the Rothe building at lunch time on October 31, 2018. Bjork's actions caught his attention (the parties disagree as to what those actions were) and Bolton conducted a strip search in a hallway near the mess hall. Bolton alleges Bjork was jumping and shouting. Bjork (and his inmate witnesses, in their statements) claims he made what could be characterized as snide remarks to Officer Bolton in front of the trainees. (Defs.' Statement of Undisputed Facts, Doc. 82, ¶ 1; Plaintiff's version of this event is found at Doc. 87–2 at 21-23.) The factual issues over which there are conflicts are whether this search could be seen by others, including women trainees and other inmates, and whether it was justified based on Bjork's pre-search conduct.

The Fourth Amendment guarantees "[t]he right of the people to be secure ... against unreasonable searches."  U.S. Const., amend. IV.  The right "extends to incarcerated prisoners." *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). Generally, strip searches do not violate the Fourth Amendment rights of prisoners or pretrial detainees, so long as they are conducted in a reasonable manner. *See id.* at 333–34; *Bell v. Wolfish*, 441 U.S. at 558 (finding routine body cavity searches of inmates after outside contact to be constitutional if conducted in

a reasonable manner). However, strip searches that are "excessive, vindictive, harassing, or unrelated to any legitimate penological interest" may be unconstitutional. *Michenfelder*, 860 F.2d at 332.

Determining if a search is reasonable under the Fourth Amendment requires that a court conduct a case-by-case "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell* at 559. "The required factors for courts to consider include: (1) the scope of the particular intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted." *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (en banc) (internal quotation marks omitted).

Unclothed visual body cavity searches in prison are almost always "reasonably related to legitimate penological interests" in discovering hidden weapons and contraband. *See Michenfelder*, 860 F.2d at 336. For example, in *Bell*, 441 U.S. 520 (1979), the Supreme Court allowed a prison to require inmates "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution" because prisons are "fraught with security dangers." *See Bell* at 558-60. *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318 (2012), allowed a jail to require arrestees headed to the jail's general population "to remove their clothing" and then "lift [their] genitals,

turn around, and cough in a squatting position." *Id.* at 323. The Supreme Court had no problem that the searches occurred "regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history." *Id.* at 324. And, in *Michenfelder*, 860 F.2d at 328, the Ninth Circuit allowed prison officials to conduct strip searches "every time" an inmate left or returned from the high-security unit housing inmate cells, or moved within the unit under escort. *Id.* at 329-30; *see also May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (visual body cavity search was reasonable).

However, the Ninth Circuit has recognized that the strip and/or visual body cavity searches are, "frightening[ly] invasi[ve]" and "humiliating."

> The scope of the intrusion here is indisputably a frightening and humiliating invasion, even when conducted with all due courtesy.... Its intrusiveness cannot be overstated.... [T]he fact that a strip search is conducted reasonably, without touching and outside the view of all persons other than the party performing the search, does not negate the fact that a strip search is a significant intrusion on the person searched .... The feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute.

*Way v. County of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006) (internal citations and quotation marks omitted).

Great deference must also be given to prison officials' assessments of their interests because "[p]rison administration is ... a task that has been committed to the responsibility of [the legislative and executive branches], and separation of

powers concerns counsel a policy of judicial restraint. Where a state penal system

is involved, federal courts have ... additional reason to accord deference to the

appropriate prison authorities." *Michenfelder*, 860 F.2d at 331 (internal citations

omitted). Therefore, "in the absence of substantial evidence in the record to

indicate that the officials have exaggerated their response to [security and

operation considerations], courts should ordinarily defer to their expert judgment in

such matters." *Bell*, 441 U.S. at 540 n. 23 (internal quotation marks and citation

omitted).

Also relevant in our analysis of the propriety of Officer Bolton's conduct is

MSP Operating Procedure 3.1.17A(3), which states, among other things, that

"Staff of the same gender as the offender will conduct offender unclothed body

searches in a private area and based on a reasonable suspicion that the offender is

carrying contraband or other prohibited material. Exigent situations may require

immediate unclothed body searches when necessary to protect staff, members of

the public, contractors, volunteers, or visitors from immediate risk of harm."

Available at https://cor.mt.gov/Policy/MSPprocedures and at Doc. 87-2 at 159.

(The version provided by Bjork in the record has been amended, but the

requirements of same gender searches and privacy are the same.)

In light of the analysis that the law requires the Court to do, construing the

facts in the light most favorable to the non-moving party, Plaintiff Bjork, summary

judgment must be denied to Officer Bolton. The Court must consider the manner,

justification, and place of the search, and the Court does not have the unequivocal

factual evidence to do so. The parties dispute whether Bjork was jumping and

shouting, or just mouthing off prior to the search, putting into question whether

Bolton had a legitimate penological justification, as he claims. The parties disagree

as to whether there were women who could see the search. The parties disagree as

to whether Bolton was able to block all angles of view from other inmates and

staff. And finally, the parties disagree as to whether Bolton could have easily

gotten the keys to take Bjork into the nearby restroom. Defendants' evidence to

support their assertion that the search was constitutionally sound is perfunctory,

and again, the Court questions why Defendants rely only on Bolton's presumably

self-serving testimony in his interrogatory responses, rather than on the multiple

angles of the video tapes. Bolton's motion for summary judgment should be

denied.

### c.  Other retaliation claims

Four of Plaintiff's claims allege some sort of retaliation towards him for

filing grievances and this lawsuit:  that Defendant Jovanovich acquiesced in

Officer Jones' actions and retaliated against Mr. Bjork for reporting Officers Jones

and Bolton (Complaint Doc. 2 at 11-12); that Christine Slaughter retaliated against

him for asking for an Americans with Disabilities Act accommodation at his

disciplinary hearing and retaliated against him by finding him guilty of disciplinary violations (Complaint, Doc. 2 at 13-14); that Defendant Strey punished Bjork for filing a PREA complaint against Defendant Bolton regarding the October 31, 2018 search (Amended Complaint, Doc. 22, Count IX); and that Defendant Cobban worked in concert with other Defendants by threatening Mr. Bjork and his witnesses with retaliatory discipline if they continued to grieve staff members involved in the October 31, 2018 strip search of Bjork (Amended Complaint, Doc. 22, Count XII).

The Court will analyze each Defendant in turn.

### 1. Jovanovich

Plaintiff's allegations against Defendant Jovanovich take two forms. The first is a respondeat superior form that alleges, since Jovanovich is in charge of Defendant Jones, Jovanovich is responsible for Jones' bad behavior. There is no vicarious liability for a supervisor on a §1983 claim, as will be discussed more thoroughly below, so these allegations are non-starters. *King v. Atiyeh*, 814 F. 2d 565, 568 (9th Cir. 1987).

The second category of allegations relates to Jovanovich's own behavior. Bjork alleges that Jovanovich made false statements in a disciplinary hearing and disciplined him inappropriately on another occasion. Three pieces of evidence put Jovanovich's possible retaliation into contention. Plaintiff filed a November 27,

2018 Offender/Staff Request form stating that he'd asked Jovanovich on

November 19th whether Jovanovich had submitted Plaintiff's PREA report against

Tom Bolton. (Doc. 87-2 at 76.) According to Bjork, Jovanovich told other officers

in front of him that Jovanovich hated Bjork for having him submit the report. *Id.*

(This incident appears a little differently in Bjork's brief, in which he states that he

was asking Jovanovich about something else. (Doc. 87 at 8.) Bjork changing his

story raises questions about his credibility, but the allegation of Jovanovich's

verbal response and the fact of the ensuing major infraction report remain the

same.)

Sure enough, Jovanovich filed a major grievance report against him later

that day, related to whether he was in someone else's cell, counter to policy, and

was conspiring with others to commit self-harm. (Doc. 87 – 2 at 35.) Bjork was

found guilty of being in an unauthorized area, but not guilty of conspiring. (Doc.

87-2 at 36.) The evidence to support the charge was photos. (He was entitled to be

in the general area to hang some information on a bulletin board, but not to be in

another inmate's cell.) Both parties have submitted the photos (Bjork's filing is at

Doc. 87 – 2 56 – 69), which are almost impossible to assess due to the quality of

the reproduction in the filing. Defendants submitted the photos but did not refer to

them in their Statement of Undisputed Facts and have not characterized what they

supposedly represent. In their current form, they are useless to the Court to understand whether Bjork was visibly in someone else's cell.

Also on this same day, Sergeant Brett Coughlin wrote Bjork a major infraction for bartering or trading and disruptive conduct, based, allegedly, on hearing another inmate offer Bjork something for legal writing. (Doc. 87–2 at 34.) There is apparently no evidence in the record that this infraction went to hearing or that he was disciplined for it, though the Court cannot disregard the possibility that the parties have failed to point to it. Bjork alleges that Coughlin is Jovanovich's brother-in-law and concludes the infraction was a form of retaliation against Bjork, directed by Jovanovich.

Considering the legal framework for retaliation, Bjork has successfully resisted summary judgment. The Court is to consider proximity in time between the alleged retaliation and the protected speech. Bjork has at least put in question whether his interaction with Jovanovich, in which Jovanovich allegedly expressed hatred of Bjork, led to the two immediately following major infraction reports. One infraction report apparently did not go to hearing, and the other resulted in conviction on only one of two charges. There is at least the possibility that these infractions were written with an unlawful motive.

Defendants' choice not to file any reply brief on this issue is puzzling. If the photos in the record of Bjork in the cell block show Bjork in another inmate's cell,

and support summary judgment, it is Defendants' burden to establish that. They have not, and so summary judgment should be denied.

### 2. Slaughter

Plaintiff Bjork asserts that Defendant Slaughter retaliated against him for requesting an ADA accommodation at his hearing, but there is no evidence in the record that he was entitled to one, and a disciplinary hearing is not the method to request one. Doc. 87-2 at 27 is a November 21, 2018 notation about emailing someone about an ADA accommodation, and it appears Bjork did request an accommodation on more than one occasion in various kites. (Doc 87-2 at 82.) Doc. 87–2 at 52 is the Montana Department of Corrections Notice of Rights for Inmates with Disabilities. It includes what an inmate should do to receive accommodation, including sending an Offender/Staff Request form directly to the ADA coordinator. Bjork finally followed this procedure in September 2019, after the occasions on which he says he was retaliated against. Every time he was denied an ADA accommodation, he was told that he was not entitled to one because there was none in his file. That is not retaliation on Defendant Slaughter's part.

Bjork also cannot establish a nexus between his asking for an accommodation and Slaughter finding against him in disciplinary hearings. An equally plausible explanation is that he was occasionally in violation of policy. In fact, Slaughter was the disciplinary hearings officer who found him not guilty of

one of the allegations in Jovanovich's violation report. (Doc. 87-2 at 36.) None of the factors weigh in favor of Slaughter having retaliated against Bjork for asking for an ADA accommodation.

(Finally, as an aside, Bjork refers repeatedly to the "settlement agreement in Langford v. Bullock" and appears to rely on a part of the agreement that discussed conferral before litigation. (Docs. 87-2 at 86; 88 at 2.) The section does not apply to Bjork as an inmate. It is the mechanism established by the parties to the settlement for handling disputes arising under their agreement. It does not create procedural rights for Bjork.)

The motion for summary judgment should be granted as to Christine Slaughter.

### 3.  Strey

Plaintiff Bjork's allegations against Defendant Strey are that he retaliated against Bjork by writing him up for an infraction for lying and hindering an officer, on the basis that Strey concluded that Bolton had not committed a PREA assault. It is important to keep separate the analysis on this claim, a retaliation claim, from the illegal search claim Bjork alleges against Bolton himself. The claims involve different standards and definitions and though they ostensibly deal with the same underlying events, they must be analyzed within different frameworks.

MSP has a policy to guide its compliance with and enforcement of the Prison Rape Elimination Act of 2003 (PREA, found at 34 U.S.C. § 30301 et seq.). *See* MSP Operational Procedure 1.1.17 at https://cor.mt.gov/Policy/MSPprocedures. (Bjork also filed a copy of the policy at Doc. 87-2 at 166 – 176. There are structural and textual differences between the different versions of the document but the operative sections are the same. Significant changes will be noted. The available versions appear to pre- and post-date the version that should have been operative at the time of Bolton's search.)

Officer Strey was the investigating officer assigned to Bjork's PREA allegation against Tom Bolton. Bjork took advantage of the procedure under MSP OP 1.1.17(III)(F)(3)(a) to report his allegations to the infirmary, where the report was accepted on the proper incident report form. Doc. 79 at 2-3. As a result of Bjork's report, and pursuant to MSP OP 1.1.17(III)(G)(1)(a), Defendant Bolton was disallowed from being in proximity to Bjork throughout the investigation, so he could not work in Bjork's unit while it was pending.

Officer Strey's evaluation of Bjork's allegation was directed not to "use a standard higher than preponderance of the evidence in determining whether allegations of sexual abuse or sexual harassment are substantiated…" MSP OP 1.1.17(III)(K)(10).

In relevant part, the policy defines sexual abuse by staff as:

Sexual acts, sexual contact or any other intentional contact, either directly, through the clothing or with an object, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, any attempt, threat, or request by an employee or service provider to engage in these activities, any display by an employee or service provider of his or her uncovered genitals, buttocks, or breast in the presence of an inmate, or voyeurism by an employee or service provider, when these acts are unrelated to official duties or where the employee or service provider has the intent to abuse, arouse, or gratify sexual desire.

MSP OP 1.1.17(II). Bjork also occasionally refers to Bolton's conduct as sexual harassment by staff, which is defined as: "Repeated verbal comments or gestures of a sexual nature to an inmate by an employee or service provider, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures." *Id.*

The final pertinent aspect of MSP's PREA policy is that "[f]or the purpose of disciplinary action, a report of sexual abuse *made in good faith based upon a reasonable belief that the alleged conduct occurred* will not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation." MSP OP 1.1.17(O)(10) (emphasis added). This current version actually differs from the policy provided by Bjork in a potentially meaningful way. The prior policy, submitted by Bjork, stated that "reports made in bad faith, which includes deliberately malicious reports by offenders or other parties, will result in disciplinary action and/or criminal charges." (Doc. 87-2 at 168.)

Strey's task, then, was to review the available evidence regarding Bjork's PREA claim and determine whether sexual abuse (or harassment) had occurred. If not, he was not, according to this last section in the current policy, obliged to discipline Bjork for lying, but neither was he barred from doing so. Under the policy Bjork submitted, Strey may actually have felt compelled to discipline Bjork.

The Court is reluctant to speculate about Strey's thought process, but there are a few salient points. First, there has never been an allegation from Bjork in this litigation that Bolton touched him, directly or indirectly. Under the definition of sexual abuse above, based on the videos and applying a standard of preponderance of evidence, Strey readily could have concluded that no sexual abuse occurred.[4] Additionally, due to the apparent clarity of the evidence to him, his choice to discipline Bjork for lying and forcing Bolton out of his duties during the investigation are not unreasonable. (The hearing officer makes the decision of guilt "if he/she is persuaded by the evidence that an infraction occurred." MSP OP 3.4.1(III)(B)(2)(l)(3)(i).) None of this is to say anything about whether the search itself was constitutionally sound—that is a different analysis, with different

---

[4] Again, as explained above, the Court is unsure why Defendants chose not to submit a copy of the video tapes for *in camera* review, if it is exculpatory. However, at this point, the Court need not decide what the video tape shows. It is sufficient for retaliation purposes to know that Strey viewed it, as did the hearing officer and appeals officers who disciplined Bjork. They could have concluded by viewing the tape what is also otherwise uncontradicted, that Bolton did not touch Bjork.

requirements. But given the standards and policies with which Strey had to work, his filing of a disciplinary action against Bjork does not appear to be unlawful retaliation. Bjork filed a claim that requires contact under the PREA definition, and there was none. (The harassment claim, though only occasionally alleged by Bjork and always in tandem with his assault or abuse claim, is equally unavailing. Bjork never makes an allegation of repeated verbal sexual comments or gestures by Bolton towards Bjork, and it seems like throwaway language that he adds for emphasis.)

Summary judgment should be granted to Defendant Strey.

### 4. Cobban

Defendant Cobban moves for summary judgment based on being unable to find any document from Cobban on the right date that allegedly threatens Bjork. (Doc. 81 at 7.) This response is insufficient, since Bjork provides several grievances that Cobban responded to that could be the basis of his claim. (Doc. 87-2 at 84, 85, 87, and 89.) However, though the scans of these documents are difficult to read, there is nothing there that appears to be retaliation on the part of Cobban. She states, in different forms in different responses, that the investigation of Bjork's PREA complaint is complete and that he may face additional charges related to it, which he did. There is no suggestion that Cobban herself is

responsible for any action other than responses to grievances, and her statements do not appear to be threats. Summary judgment should be granted to Cobban.

### d.  Claim against Dr. Rees

Plaintiff's fifth claim is that Dr. Rees failed to treat the injuries Mr. Bjork received on October 31, 2018 (Amended Complaint, Doc. 22, Count VIII). Defendant has moved for summary judgment based on the fact that Dr. Rees did not provide care for Bjork at the time, and that the treatment Bjork received was constitutionally sufficient. (Doc. 81 at 3 – 4.)

To state a §1983 claim for failure to provide medical care, a prisoner must allege a defendant's "acts or omissions [were] sufficiently harmful to evidence a deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Toussaint v. McCarthy*, 801 F.2d 1080, 1111 (9th Cir. 1986).

In the Ninth Circuit, the test for deliberate indifference to medical needs is two-pronged:  (1) "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"; and (2) "the plaintiff must show the defendant's response to the need was deliberately indifferent."  *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

The second prong requires a showing of: "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Wilhelm*, 680 F.3d at 1122 quoting *Jett*, 439 F.3d at 1096. "Such indifference may be manifested in two ways.  It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. U.S.*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 104-05).

Further, §1983 will not impose liability on supervising officers under a respondeat superior theory of liability. *Monell*, 436 U.S. at 691-94. That is, a defendant will not be held liable just because they oversee the State, a prison, or the Department of Corrections. Instead, supervising officers can be held liable under section 1983 "only if they play an affirmative part in the alleged deprivation of constitutional rights." *King v. Atiyeh*, 814 F. 2d 565, 568 (9th Cir. 1987).

The Ninth Circuit has identified four general situations in which supervisory liability may be imposed:

> "for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others. … In a section 1983 claim, a supervisor is liable for the acts of his subordinates if the supervisor participated in or directed the violations, or knew of the violations of subordinates and failed to act to prevent them. The requisite causal connection may be established when an official sets in motion a 'series of

acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms.''

*Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009) (internal citations and quotation omitted.)

Plaintiff's failure to comply with Local Rule 56.1(b) makes parsing his response exceedingly difficult. He does not, in his Statement of Disputed Facts (Doc . 88), specifically support any of the claims he makes about his medical treatment. But neither does Defendant Rees provide any undisputed facts regarding Plaintiff's medical treatment, other than to refer generally to Exhibit A, which is a set of documents regarding Plaintiff's treatment. However, the documents establish that Bjork was seen on an emergency basis on October 31, 2018 and underwent the sexual assault protocol. (Doc. 79 at 1 - 2.) The records show that his bleeding was related to a pre-existing condition. *Id*. Bjork was seen again by a nurse on November 21, 2018, and was referred for a doctor's appointment. He submitted several requests for additional flushable wipes, which were approved. (Doc. 79 at 7–8, 11–12, 15.)

Plaintiff has not established by expert or otherwise that his treatment was lacking. Further, the documents available do not reflect treatment by Dr. Rees at any time, or any evidence that Dr. Rees conspired with someone to be deliberately indifferent to Plaintiff's medical needs. Dr. Rees is entitled to summary judgment.

Based upon the foregoing, the Court issues the following:

34

**ORDERS**

1.  Defendant's motion to file under seal (Doc. 78) is GRANTED;

2.  Plaintiff's "Response Brief" (construed as a motion to compel) (Doc. 75) is
    GRANTED in part and DENIED in part. Within ten days of the filing of this
    order, Defendants will file all video and photographic evidence in this matter
    with the Court under seal. Defendants' counsel will also file a document
    with the Court that establishes that he complied with this Court's prior order
    regarding records related to Defendant Jones.

3.  Plaintiff's "Response Brief" (construed as a motion to compel) (Doc. 76) is
    DENIED; and

4.  Plaintiff's motion for mediation (Doc. 89) is DENIED.

**RECOMMENDATIONS**

1.  Plaintiff's Motion for Emergency Prohibitory Injunction (Doc. 77) should be
    DENIED;

2.  Plaintiff's motion for sanctions and default judgment and/or contempt (Doc.
    70) should be DENIED; and

3.  Defendants' motion for summary judgment (Doc. 80) should be DENIED as
    to Defendants Bolton and Jovanovich, and GRANTED as to Defendants
    Slaughter, Rees, Cobban, Strey, and Jones.

**NOTICE OF RIGHT TO OBJECT TO FINDINGs & RECOMMENDATION**
**AND CONSEQUENCES OF FAILURE TO OBJECT**

The parties may object to the Findings and Recommendations within 14

days.  *See* 28 U.S.C. § 636(b)(1).[5]  Failure to timely file written objections may bar

a de novo determination by the district judge and/or waive the right to appeal.

Bjork must immediately notify the Court of any change in his mailing

address by filing a "Notice of Change of Address."  Failure to do so may result in

dismissal of his case without notice to him.


DATED this 9th day of February, 2021.




John Johnston
United States Magistrate Judge




---

[5] This deadline allows a party to act within 14 days after the Findings and
Recommendation is "served."  Federal Rule of Civil Procedure 6(d) allows three
additional days after the period would otherwise expire.